NOT DESIGNATED FOR PUBLICATION

No. 123,611

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBERT T. SMITH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; MERLIN G. WHEELER, judge. Opinion filed January 21, 2022.
Affirmed in part, vacated in part, and remanded with directions.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Laura L. Miser*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*,
attorney general, for appellee.

Before BRUNS, P.J., GREEN and ISHERWOOD, JJ.

PER CURIAM: Robert T. Smith appeals the trial court's order requiring him to pay
$12,547.39 in restitution at a rate of $200 per month upon him finding a job while in
prison. Smith argues that the court abused its discretion when it entered this order in two
ways: (1) because his indigency and limited earning capacity meant that he could not
comply with the court's restitution order even if he obtained a prison job and (2) because
his indigency and limited earning capacity meant that the amount of restitution that the
court imposed was too burdensome. Of Smith's two arguments, his first argument is
persuasive. Because Smith could never pay the restitution as ordered by the court while

1

serving his prison sentence, we conclude that this part of the court's restitution order was unworkable. Yet, under the facts of Smith's case and Kansas caselaw, we determine that the overall amount of restitution that the court ordered was appropriate. Thus, we vacate that part of the trial court's restitution order requiring Smith to pay restitution in the amount of $200 per month while in prison if he secured a prison job. We, however, leave in effect the trial court's oral pronouncement requiring Smith to pay restitution in the amount of $200 per month if he secured a work release job while in prison. And so, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

FACTS

On March 27, 2020, Smith and his friend, Zachary Stephenson, had a physical fight with each other. The fight ended when Smith struck Stephenson in a way that caused Stephenson to lose his balance, fall, and hit his head hard enough that he suffered brain damage.

Based on the preceding facts, the State charged Smith with knowingly committing an aggravated battery that caused great bodily harm to Stephenson; this was a severity level 4 person felony in violation of K.S.A. 2020 Supp. 21-5413(b)(1)(A). Eventually, Smith entered into a plea agreement with the State under which the State amended Smith's charge to reckless aggravated battery causing great bodily harm; this was a severity level 5 person felony in violation of K.S.A. 2020 Supp. 21-5413(b)(2)(A). At Smith's plea hearing, the trial court accepted Smith's no-contest plea in accordance with his plea agreement.

At his sentencing, Smith agreed that his criminal history score was I under the revised Kansas Sentencing Guidelines Act (KSGA) grid. He also agreed that the severity of his crime placed him in a border box on the KSGA grid. Thus, while the trial court

2

could sentence Smith to probation, Smith's presumed sentence under the KSGA grid was prison. See *State v. Colbert*, 24 Kan. App. 2d 756, 757, 953 P.2d 1058 (1998) (holding that in "KSGA border box cases, the sentence is presumed imprisonment, but the court *may* impose an optional nonprison sentence on making specified findings on the record"). As a result, Smith asked the trial court to sentence him to probation instead of his presumed prison sentence. But the court rejected Smith's request. Afterwards, it sentenced Smith to 32 months' imprisonment followed by 24 month's postrelease supervision. Because both parties agreed that a separate hearing on restitution was necessary, the trial court did not address restitution at Smith's sentencing. Instead, as requested by both parties, it scheduled a separate hearing to address restitution.

At the outset of this restitution hearing, the State and Smith agreed that he owed the following sums to the following organizations: (1) $9,620.79 to Newman Regional Health; (2) $42,053.62 to Stormont-Vail Health; (3) $2,372.60 to Lyon County Ambulance; and (4) $554 to Topeka Ear, Nose, and Throat. Once the parties agreed to this, they also agreed that Smith's indigency meant that any order requiring Smith to pay the $42,053.62 he owed Stormont-Vail Health would be unworkable. The State, however, noted that it "would defer to the Court's discretion," explaining that it believed Smith's indigency also meant that any order requiring Smith to pay the $9,620.79 he owed Newman Regional Health would be unworkable. The State therefore requested that the trial court enter an order requiring Smith to pay restitution to Lyon County Ambulance and Topeka Ear, Nose, and Throat.

Meanwhile, Smith argued that the trial court lacked authority to make him pay restitution while in prison. He also argued that the court should consider his limited resources when determining how much restitution he should pay. In support of this argument, Smith testified and entered an affidavit discussing his finances into evidence. Together, Smith's testimony and financial affidavit indicated the following: (1) that he had graduated high school; (2) that he had no disabilities preventing him from obtaining

3

employment; (3) that his highest paying job at an aerospace company, which he lost around 2018 because of his alcohol addiction, paid $14.63 an hour; (4) that his most recent job at a fast-food restaurant, which he lost on the revocation of his bond because of methamphetamine use, paid $8.50 an hour; (5) that he was homeless before the revocation of his bond; and (6) that he was not currently paying child support for his two children.

In the end, the trial judge presiding over Smith's restitution hearing ordered Smith to pay the entire amounts that he owed Newman Regional Health, Lyon County Ambulance, and Topeka, Ear, Nose, and Throat, which totaled $12,547.39. In doing so, the trial judge gave the following explanation from the bench why Smith should pay $12,547.39 in restitution at a rate of $200 per month:

> "I agree in this case that the ability to pay the Stormont-Vail bill is probably beyond the reach of the defendant for any reasonable period of time considering that when he returns from the Secretary of Corrections undoubtedly there will be a child support obligation that will be outstanding at that point in time and probably there will be an accrued arrearage by that point in time as well. And understandably that child support obligation is going to take a priority over any other payment obligation.
>
> "I think what I'm going to do is this, obviously I'll note for the record that at the time of sentencing *I made an indication that costs and assessments could be collected during incarceration and that included restitution*. And I also made the notation that I recommended that KDOC [Kansas Department of Corrections] require payment of costs, assessments, and restitution as a condition of post-release supervision. *Now, that would enable some payments to be made on the restitution obligation, as well as the other costs and assessments during the period of incarceration should Mr. Smith become eligible for any type of work release or work activities while in custody*. And we do have prisoners from time to time that are employed at outside jobs that have that capability. So I think I have the ability to consider that possibility in determining his ability to pay here as well. While I can't predict with any degree of certainty what he might earn in the prison environment, assuming that he conducts himself appropriately he should become eligible for that opportunity at some point in time.

"I'm going to—I want the journal entry to reflect that I believe the total restitution obligation to be as agreed by counsel at $54,601.01. That is an amount that may be factored in by the parole board or post-release supervising authority when he is released if they undertake the recommendation that I made. I will order as far as payment is concerned that he pay in restitution the sum of $12,547.39, which represents the amounts of the Topeka ENT billing, the Lyon County Ambulance billing, and the Newman Regional Health billing.

"Mr. Smith has no physical disabilities of which we are aware. He has reasonable trade skills which would allow him to be employed at employment compensation levels certainly greater than minimum wage and certainly greater than what he was earning at [the fast-food restaurant]. As his employment history would indicate, he is capable of earning wages in excess of $14 per hour. And while it may take some time to do so, I'm not aware of any time limit on this restitution obligation, so, therefore, I am going to fix, his restitution at the sum of $200 per month at such time as he becomes employed, which would allow this to be paid in a fairly reasonable time period." (Emphases added.)

After entering this oral restitution order, Smith's attorney asked the trial court for clarification about whether it could make Smith pay restitution while in prison. Smith's attorney explained that it was his belief that the trial court could make only recommendations to "the parole board" regarding what Smith should pay in restitution on his release from prison. In rejecting this argument, the trial judge explained: "I have already recommended that [KDOC] require payment of restitution upon release, but I think I have the ability to order it independently so that collection could be enforced after his release by our court trustee."

Finally, on the trial court's request, the State agreed to summarize the trial court's oral restitution order in a written order. Later, in accordance with the trial court's request, the State submitted a journal entry of the restitution hearing as well as a restitution order. Smith's attorney approved both journal entries, and the trial court ultimately signed both orders. The journal entry that the State drafted stated: "[T]he Court orders the defendant to pay $200 per month while incarcerated at [KDOC]." Likewise, the restitution order

which the State drafted required the following: "Defendant will pay $200.00 per month while incarcerated at [KDOC]."

Smith timely appeals.

ANALYSIS

*Did the trial court impose an unworkable restitution plan?*

On appeal, Smith asks us to vacate the trial court's restitution order and remand with directions requiring the court to impose a workable restitution plan. Smith's primary argument is that the trial court abused its discretion because its order requiring him to pay $12,547.39 in restitution at a rate of $200 per month *on finding a job in prison* was unreasonable. In making this argument, Smith stresses that even if he were able to get a job while in prison, he would earn very little. According to Smith, the most he could earn in a month at a prison job would be $32.55. Relying on his current indigency and limited earning capacity, Smith further argues that the total amount of restitution that the trial court ordered him to pay was too burdensome. Also, in a related alternative argument, Smith contends we should vacate and remand to the trial court with directions to correct his restitution order so that it accurately reflects its oral rulings from the bench. In other words, he wants us to vacate and remand with directions that the trial court enter a nunc pro tunc restitution order stating that *he does not have to start making restitution payments until he gets a job in prison*.

Although the State agrees that a nunc pro tunc order is necessary, it contends that a nunc pro tunc order is required for a different reason. And this reason is related to its argument that the trial court entered a workable restitution plan. The State interprets the trial court's bench restitution order differently from Smith's interpretation. Instead, as to when Smith had to start paying restitution, the State contends that the trial court "clearly

6

intended" for Smith to start restitution payments "*only after he was released from prison and employed.*" (Emphasis added.) The State also contends that the trial court's oral restitution order supports that it let the KDOC decide whether Smith had to start making restitution payments while in prison. Then, based on this interpretation of the trial court's oral restitution order, the State points to Smith's past job history, lack of debts, and lack of expenses as evidence of the workability of Smith's restitution plan. Thus, the State argues that the trial court's restitution order was reasonable because the evidence shows that Smith can pay $12,547.39 in restitution at a rate of $200 per month following his release from prison.

But the State seems to make an alternative argument too. The State seems to argue that assuming the trial court ordered Smith to start paying restitution on finding a job in prison, the court's restitution plan was still reasonable. The State starts this argument by conceding that "Smith has very limited financial capacity to pay on the restitution while incarcerated." It next contends that the fact that the trial court did not order Smith to start paying restitution until he found a prison job establishes the reasonableness of the court's restitution order: "The court's intent appeared to impose the burden of $200 per month once employed. It is difficult to conclude that no reasonable person would have taken the view adopted by the district court."

*Preservation*

At his restitution hearing, Smith's attorney wrongly argued that the trial court lacked authority to make Smith pay restitution while in prison, and the trial court correctly rejected this argument. See *State v. Tucker*, 311 Kan. 565, 567-68, 465 P.3d 173 (2020) (holding that a defendant's restitution may become due while incarcerated if the trial court explicitly orders so). Yet, after the trial court correctly rejected this argument and entered its oral restitution order, Smith's attorney questioned the trial court further. At this point, Smith's attorney more fully explained his errant belief that Kansas caselaw

7

allowed the trial court to make only a recommendation to the parole board when a defendant is sentenced to prison. After the trial court rejected this argument again, Smith's attorney did not explicitly object to the trial court's restitution order.

Even if Smith's attorney did not lodge an explicit objection to the trial court's restitution order, it is readily apparent that both parties and the court considered Smith's attorney's question to the trial court about making Smith pay restitution while in prison an objection. To begin with, after the court made its oral restitution order, Smith's attorney objected to the trial court "ordering restitution when the defendant has been sentenced to the [KDOC]." And in Smith's brief, he points to his attorney's arguments at the restitution hearing as evidence that he preserved his restitution challenge. Also, in its brief, the State never argues that Smith failed to preserve his restitution challenge for appeal. The record and the parties' briefs support the assertion that Smith effectively objected to the trial court's restitution order.

In any case, "[r]estitution is part of a sentence." *State v. Johnson*, 309 Kan. 992, 996, 441 P.3d 1036 (2019). Under K.S.A. 2020 Supp. 22-3504(a), courts "may correct an illegal sentence at any time while the defendant is serving such sentence." Any sentence that "does not conform to the applicable statutory provision, either in character or punishment" is an illegal sentence. K.S.A. 2020 Supp. 22-3504(c)(1). Additionally, this court has previously reviewed restitution challenges under K.S.A. 2020 Supp. 22-3504(a). See *State v. Jackson*, No. 121,827, 2021 WL 4693244, at *14 (Kan. App. 2021) (unpublished opinion) (considering the defendant's restitution challenge under K.S.A. 22-3504[a]), *petition for rev. filed* November 8, 2021; and *State v. Garza*, No. 118,840, 2019 WL 1412444, at *5 (Kan. App. 2019) (unpublished opinion) (same), *rev. denied* 310 Kan. 1066 (2019).

Smith here argues that the trial court's restitution order violated K.S.A. 2019 Supp. 21-6604(b)—the provision governing restitution orders when Smith committed his

8

aggravated battery. See *State v. Parks*, 312 Kan. 487, 489, 476 P.3d 794 (2020) (holding that "[t]he penalty parameters for any criminal offense are fixed as of the date the offense is committed"). As a result, Smith has argued that the trial court imposed an illegal sentence in violation of K.S.A. 2020 Supp. 22-3504(a). Put another way, because restitution is part of a defendant's sentence, Smith necessarily asserts that the trial court imposed an illegal sentence on him contrary to K.S.A. 2020 Supp. 22-3504(a) by arguing that it violated K.S.A. 2019 Supp. 21-6604(b)'s rules governing restitution orders.

In summary, because Smith effectively objected to the trial court's restitution order and because Smith's sentence would be illegal if the court's restitution order violates K.S.A. 2019 Supp. 21-6604(b), Smith's restitution challenge is properly before us.

*Applicable Law*

When considering a defendant's restitution challenge to the amount or the manner in which it is paid, this court reviews the trial court's restitution order for an abuse of discretion. *State v. Holt*, 305 Kan. 839, 842, 390 P.3d 1 (2017). A trial court abuses its discretion if its decision hinges on an error of law, an error of fact, or is otherwise unreasonable. *State v. Meeks*, 307 Kan. 813, 816, 415 P.3d 400 (2018). While engaging in this review, this court has unlimited review over whether the trial court correctly interpreted and applied the law. On the other hand, this court reviews the trial court's fact-findings for substantial competent evidence. And this court evaluates the reasonableness of the trial court's restitution order by considering whether no reasonable person would have imposed the same restitution order as the trial court. 307 Kan. 816-17.

As just noted, the provision governing restitution orders when Smith committed his aggravated battery was K.S.A. 2019 Supp. 21-6604(b). Subsection (b)(1) of this provision stated:

> ". . . [T]he court shall order the defendant to pay restitution, which shall include, but not be limited to, damage or loss caused by the defendant's crime, unless the court finds compelling circumstances that would render a plan of restitution unworkable. . . . If the court finds a plan of restitution unworkable, the court shall state on the record in detail the reasons therefor." K.S.A. 2019 Supp. 21-6604(b)(1).

Under K.S.A. 2019 Supp. 21-6604(b)(1)'s plain language, absent compelling circumstances establishing that the defendant cannot repay his or her victims, a trial court should order restitution. *Holt*, 305 Kan. at 839 (holding that this provision requires a trial court to order restitution absent compelling circumstances rendering the restitution plan unworkable for the defendant).

Previously, our Supreme Court has held that K.S.A. 2019 Supp. 21-6604(b)(1) requires the trial court to order restitution because "[r]estitution is the rule and a finding that restitution is unworkable is the exception." 305 Kan. at 842. It has held that this provision's plain language establishes that a defendant carries the burden of coming forward with evidence proving that he or she cannot repay a victim. *State v. Goeller*, 276 Kan. 578, 583, 77 P.3d 1272 (2003), *overruled on other grounds by State v. Dickey*, 301 Kan. 1018, 350 P.3d 1054 (2015). It has held that when considering the fairness of any proposed restitution plan, a trial court should consider a defendant's "income, present and future earning capacity, living expenses, debts and financial obligations, and dependents." *Meeks*, 307 Kan. at 820. It has held that in some instances, especially when a trial court has ordered a defendant to remain on probation until repaying all restitution, a defendant's sentence length may be relevant to the trial court's restitution ruling. Also, it has held that when ordering restitution, a trial court should always remember that in addition to compensating victims, the ultimate goals of restitution include rehabilitating the defendant from past criminal conduct and deterring the defendant from future criminal conduct. 307 Kan. at 820.

At the same time, our Supreme Court has recognized a difference between a trial court's order requiring the defendant to start paying restitution while in prison versus an order delaying the defendant's restitution payments until the defendant's release from prison. In the recent *Tucker* decision, our Supreme Court held that a defendant's restitution obligations do not become immediately due unless the trial court explicitly orders the defendant to make restitution payments while in prison. 311 Kan. at 567-68. As applied in *Tucker*, the trial court's silence about when Tucker's restitution payments started meant that Tucker's restitution payments would not begin until he had completed his prison sentence. Then, our Supreme Court relied on this rule in accepting Tucker's argument that the trial court imposed an unworkable restitution plan. As argued by Tucker, our Supreme Court agreed that the trial court's implicit ruling that he begin paying restitution on completing his prison sentence was unreasonable because the trial court had sentenced Tucker to *life without the possibility of parole*. 311 Kan. at 567-68.

Of further note, in analyzing Tucker's restitution challenge, our Supreme Court distinguished Tucker's case from *State v. Holt*, 305 Kan. 839, *State v. Shank*, 304 Kan. 89, 369 P.3d 322 (2016), and *State v. Alcala*, 301 Kan. 832, 348 P.3d 570 (2015), because Tucker was serving a life sentence without the possibility of parole. See *Tucker*, 311 Kan. at 567. In those cases, Holt's, Shank's, and Alcala's arguments about the trial court imposing an unreasonable restitution plan hinged on the fact that they were serving *life sentences with the possibility of parole*. *Holt*, 305 Kan. at 840-41; *Shank*, 304 Kan. at 95-96; and *Alcala*, 301 Kan. at 833. Also, in those cases, our Supreme Court rejected Holt's, Shank's, and Alcala's arguments that the amount of restitution that the trial court had ordered them to pay was too burdensome given their current indigency status. *Holt*, 305 Kan. at 844; *Shank*, 304 Kan. at 96; and *Alcala*, 301 Kan. at 840. Our Supreme Court explained that none of their arguments were persuasive because none of them proved that they could not make restitution payments on their eventual parole. *Holt*, 305 Kan. at 844-45; *Shank*, 304 Kan. at 96; and *Alcala*, 301 Kan. at 840.

In addition to our Supreme Court precedent, this court has held that poverty may make a restitution plan unreasonable. In *State v. Herron*, 50 Kan. App. 2d 1058, 1064, 335 P.3d 1211 (2014), Herron argued that the trial court imposed an unworkable restitution plan when it ordered her to pay $6,864.10 in restitution during her 18-month probation term. Ultimately, this court agreed with Herron that the trial court's restitution plan was unworkable. It held that the trial court abused its discretion because even excluding Herron's other monthly expenses, Herron made just $680 per month. Given this, it held that the trial court's restitution order requiring Herron to repay the entirety of her restitution while on probation was unreasonable as it could take Herron as many as 57 years to repay $6,864.10 to her victim. 50 Kan. App. 2d at 1065-66. The *Herron* court held: "Poverty can be a sufficient legal basis, depending on the facts of a particular case, to determine that no restitution plan would be viable." 50 Kan. App. 2d 1058, Syl. ¶ 2.

Lastly, when there is a conflict between the trial court's oral pronouncements and written order regarding sentencing issues like restitution, the trial court's oral pronouncements control. *State v. Edwards*, 309 Kan. 830, 835, 440 P.3d 557 (2019). As a result, our Supreme Court has determined that a written restitution order that is at variance from a judge's oral restitution order is a clerical error that may be corrected by a nunc pro tunc order so that it reflects the actual sentence pronounced from the bench, providing that this actual sentence is a legal sentence. 309 Kan. at 835-36.

*Discussion*

Having outlined the applicable law, we now address the parties' conflicting interpretations of the trial court's restitution order. Again, in his brief, Smith contends that the trial court abused its discretion when it ordered him to pay $12,547.39 in restitution at a rate of $200 per month on finding a job in prison. But the State counters that under the correct interpretation of the trial court's oral restitution order, the court clearly intended Smith to start paying restitution only after Smith was released from prison and employed.

Even though the parties agree that Smith's employment was a condition precedent to Smith's restitution payment obligation coming into effect, they disagree on whether the trial court intended for Smith to start paying restitution on getting a job in prison or on getting a job after his release from prison.

But there are significant problems with the State's interpretation of the trial court's oral restitution order. Indeed, not only is the State's current interpretation of the trial court's oral restitution order incorrect, but also it is inconsistent with its interpretation of the court's oral restitution when it drafted the written restitution order below.

To review, in ruling from the bench, the trial court noted that at Smith's sentencing, it told Smith "that costs and assessments could be collected during incarceration and that included restitution." Immediately after stating this, the trial court explained that on Smith's sentencing journal entry, it had recommended that KDOC make Smith pay restitution while on postrelease supervision. And the court then stated: "Now, that would enable some payments to be made on the restitution obligation, as well as the other costs and assessments during the period of incarceration should Mr. Smith become eligible for any type of work release or work activities." Also, at the conclusion of Smith's restitution hearing, the trial court rejected Smith's attorney's question about its authority to make Smith pay restitution while in prison by telling him that it had "the ability to order [restitution] independently so that collection could be enforced after his release by our court trustee."

In arguing that the trial court "clearly intended" for Smith to start paying restitution only after Smith was released from prison and employed, the State never addressed the preceding comments and ruling by the trial court. Instead, the State's entire argument is that the trial court's "discussion regarding [Smith's] ability to pay in prison was couched in terms as to be reasonable to conclude the [trial] [c]ourt left that issue to the discretion of the [KDOC]." Not only is this argument conclusory, but it is incorrect.

13

In ruling from the bench, the trial court never indicated that it was leaving anything other than Smith's potential employment in prison to KDOC's discretion. And it certainly never implied, let alone ruled, that Smith's restitution obligation would not start until he was released from prison and employed. Despite the State's argument to the contrary, the trial court's oral restitution order was not couched in terms so that it would be reasonable to conclude that the trial court left that issue to the discretion of KDOC.

In contrast, as evidenced by the comments and ruling just discussed, the trial court intended for Smith to start paying restitution once Smith obtained a job in prison. By telling Smith "that costs and assessments could be collected during incarceration and that included restitution," the trial court specifically said that it had previously warned Smith that restitution could be collected during his incarceration. This is apparent because the clause "and that included restitution" refers to "incarceration." Similarly, by stating "should Mr. Smith become eligible for any type of work release or work activities while in custody" "that would enable some payments to be made on the restitution obligation, as well as the other costs and assessments during the period of incarceration," the trial court specifically ruled that Smith could start paying restitution if he secured a job while in prison. But plainly, there was no reason for the trial court to state that Smith could start paying restitution on obtaining a job in prison unless it intended for Smith to start paying restitution upon acquiring a job in prison. Also, by stating that it had the ability to order restitution independently so that collection could be enforced after his release from the court trustee when rejecting Smith's attorney's question about its authority to make Smith pay restitution while incarcerated, the trial court all but explicitly stated that it intended for Smith to start paying restitution once Smith obtained a job while in prison.

So although the trial court certainly could have made a clearer restitution order from the bench, it is readily apparent that it intended for Smith to start paying restitution once he secured a job in prison if that condition occurred. Hence, in addition to the fact that nothing supports the State's contention that the trial court intended for Smith to start

14

paying restitution only after he was released from prison and employed, the court's oral restitution order shows that it intended for Smith's to start paying restitution on finding a prison job.

Yet, even if we were to ignore the preceding, the State's argument is particularly unpersuasive since the State drafted the disputed written restitution order. Again, at the end of Smith's restitution hearing, the trial court asked the State to complete the journal entry of the restitution hearing and restitution order on its behalf. The State agreed, drafting and approving both documents. And so, when the State contends that a nunc pro tunc order is necessary to fix the trial court's written restitution order, it is requesting a nunc pro tunc order to correct the State's misunderstanding of the court's oral restitution order.

But to the point, even if the State now contends that we may interpret the trial court's oral restitution order as "clearly" being "couched in terms as to be reasonable to conclude the [trial] [c]ourt left that issue to the discretion of the [KDOC]," this assertion directly contradicts what the State stated in the written restitution hearing journal entry and restitution order. Again, in both those documents, the State's drafted language that required Smith to start paying his restitution at a rate of "$200 per month *while imprisoned at KDOC*." (Emphasis added.)

Turning to the timing element of the trial court's restitution order, it is important for us to first note an assertion made by the State in its apparent alternative argument. There, the State agreed that Smith "has very limited financial capacity to pay on the restitution while incarcerated . . . ." Also, even though at Smith's restitution hearing the State never explicitly told the trial court that any order requiring Smith to pay restitution while in prison would be unworkable, the State's arguments focused on Smith's ability to pay restitution once he was on postrelease supervision. To be sure, the State never conceded that Smith's limited earning capacity in prison made the trial court's restitution

plan unworkable. The State, however, conceded that Smith had a very limited income while in prison.

Notwithstanding this concession, as stressed by Smith in his brief, the money he could earn each month if he obtained a prison job would not cover even a quarter of his $200 monthly restitution obligation. Indeed, even if we were to assume that Smith secured a prison job that paid the highest daily rate available—$1.05—and that Smith *worked every day* in a 31-day calendar month, Smith would earn only $32.55 each month. And it is undisputed that Smith was homeless with no assets when his restitution hearing occurred.

Simply put, the State's concession, Smith's arguments, and our court's and our Supreme Court's precedent establishes that the trial court's restitution plan was unworkable to the extent that it ordered Smith to start paying restitution on securing a prison job. As discussed, while Smith might obtain a job while in prison, that job would allow him to pay just a small fraction of his monthly restitution obligation. And as stressed by Smith in his brief, if the trial court's restitution order went into effect, his inability to pay his $200 monthly restitution obligation while in prison would result in his debt probably being sent to a collection service that could then impose hefty fees on him for his failure to timely pay his restitution. See K.S.A. 2020 Supp. 20-169(c)(5) (stating that the contracting agent providing collection services may impose a fee up to 33% of the defendant's underlying restitution debt if the defendant misses a payment); see also *State v. Miller*, No. 113,100, 2016 WL 3460371, at *6 (Kan. App. 2016) (unpublished opinion) (holding that the imposition of a 33% collection fee did not make Miller's sentence illegal).

On the other hand, the possibility that Smith may have to pay hefty fees for missing restitution payments is not an issue by itself. It, however, is problematic here because Smith could never comply with the restitution order imposed by the trial court if

he acquired a prison job. Imposing such overly burdensome restitution plans turns restitution into a potentially never-ending punishment that is inconsistent with the ultimate goals of restitution—compensating any victims, rehabilitating the defendant from past criminal conduct, and deterring the defendant from future criminal conduct. *Meeks*, 307 Kan. at 820. This is unreasonable. This portion of the trial court's restitution order, requiring Smith to start paying restitution upon securing a prison job, is an unworkable restitution order and is therefore vacated.

As a result, there is just one issue left for us to address—whether the trial court abused its discretion by ordering Smith to pay too much restitution. Smith's specific argument is that the trial court acted unreasonably when it ordered him to pay $12,547.39 in restitution given his lack of savings, his low likelihood of finding a high paying job on his release from prison, and the possibility that it could take him several years to pay off his restitution debt. The State counters that Smith's job history, lack of debts, and lack of expenses prove that Smith can make the $200 monthly restitution payments following his prison release.

As emphasized by the State, Smith's evidence regarding his finances showed that while he had no assets, he also had no debts or expenses. And even if the trial court considered Smith's potential future child support obligation when making its oral restitution order, Smith admitted that he did not have any child support obligations when his restitution hearing occurred. On this basis, nothing in Smith's brief states that he is currently paying child support or addresses how much child support he may have to pay in the future. Because Smith carried the burden of establishing that he could not make restitution payments, Smith cannot rely on the possibility of future child support payments as evidence of his restitution plan's unworkability. See *Goeller*, 276 Kan. at 583 (holding that the defendant carries the burden of establishing that he or she cannot pay repay the victim via restitution).

17

Also, Smith's testimony and financial affidavit establish that during the two years before his incarceration, he held jobs making between $8.50 per hour and $14.63 per hour. This means that even if Smith made the lower hourly rate, he would still earn $1,360 per month before taxes working full-time during a four-week calendar month. In other words, disregarding taxes, Smith would have $1,160 a month to live on after making his $200 monthly restitution payment. Even though $1,160 of earnings per month is not a huge sum, Smith's potential earnings on his release from prison are significantly higher than Herron's potential earnings of $680 per month. Also, unlike Herron, Smith has no fixed term in which he must pay the balance of his restitution debt. *Herron*, 50 Kan. App. 2d at 1065-66. So, Smith is in a much better position than Herron was to successfully comply with the trial court's restitution order. In turn, *Herron*'s precedent indicates that Smith's earning potential on his release from prison is too high to render the trial court's restitution plan requiring Smith to pay $200 per month unworkable.

Most importantly, this conclusion is supported by our Supreme Court's decisions in *Holt*, *Shank*, and *Alcala*. In *Holt*, our Supreme Court rejected Holt's assertion that his current status as an unemployed student who had less than $100 and would only make $9 per month in prison meant that the trial court's order requiring him to pay $12,406.58 in restitution on obtaining parole was unreasonable. 305 Kan. at 844. In doing so, our Supreme Court also rejected Holt's comparison of his case to *Herron* because unlike Herron, "in Holt's case, the restitution [was] not immediately payable." 305 Kan. at 844. In *Shank*, our Supreme Court rejected Shank's assertion that his current lack of assets meant that the trial court's order requiring him to pay $100,427.65 in restitution on obtaining parole was unreasonable. 304 Kan. at 95-96. And in *Alcala*, our Supreme Court rejected Alcala's argument that his lengthy prison sentence and limited earning potential in prison meant that the trial court's order requiring him to pay $43,230.77 in restitution on obtaining parole was unreasonable. 301 Kan. at 840.

18

Smith's case is very similar to Holt's case. Both essentially had no assets when the trial court ordered them to pay about $12,500 in restitution. As a result, our Supreme Court's decision to reject Holt's argument that the trial court imposed an unworkable restitution plan by ordering him to pay about $12,500 on his release from prison undermines Smith's unworkability argument. But even assuming that the *Holt* decision left any room for doubt as to whether the amount of restitution that the trial court imposed in Smith's case was workable, the *Shank* and *Alcala* decisions definitively establish that the trial court here imposed a workable amount of restitution. Plainly, if the trial courts in Shank's and Alcala's cases did not abuse their discretion by requiring them to pay $100,427.65 and $43,230.77 in restitution, respectively, despite their current indigent status, then the trial court in Smith's case did not abuse its discretion by requiring Smith to pay $12,547.39 in restitution despite his current indigent status.

The State has persuasively argued that Smith's job history, lack of debts, and lack of expenses show that Smith can pay $12,547.39 in restitution at a rate of $200 per month on his release from prison. In summary, Smith's financial history together with this court's and our Supreme Court's precedent upholding similar or more burdensome restitution plans demonstrate that the amount of restitution that the trial court imposed was workable. Also, we leave in effect the trial court's oral pronouncement requiring Smith to pay restitution in the amount of $200 per month if he secured a work-release job while in prison.

CONCLUSION

To conclude, even though Smith and the State have different interpretations of the trial court's oral restitution order, a review of the order proves that it ordered Smith to start paying restitution upon securing a prison job. Because Smith has established that he could not possibly comply with this part of the trial court's restitution order, he has also showed that the court imposed an unworkable restitution order. In this respect, the trial

court abused its discretion. Nevertheless, Smith has not established that the specific amount of restitution that the trial court imposed was unworkable in light of his financial history and Kansas caselaw. We vacate that part of the trial court's restitution order requiring Smith to pay $200 per month restitution while in prison if he acquired a prison job, but we otherwise affirm the remaining oral pronouncements of the trial court's restitution order.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.